# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| IN RE: EMERSON ELECTRIC CO.  ) <br> WET/DRY VAC MARKETING       ) <br> AND SALES LITIGATION,        ) <br>                              ) <br>                              ) <br>                              ) <br>                              ) <br>                              ) | MDL NO: 2382 <br><br><br> Case No. 4:12MD2382 HEA |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendant's Motion to Exclude the Opinions of Stefan Boedeker, [Doc. No. 227], and Defendant's Motion to Exclude the Opinions of Laurence Nagel, [Doc. No. 229]. Plaintiffs oppose the Motions. For the reasons set forth below, the Motions will be granted.

## Background

This multi-district action was brought by plaintiffs on behalf of a putative class of purchasers of Defendant's RIGID brand vacuums. Plaintiffs claim Defendant misled plaintiffs through advertising the "peak horsepower," the maximum potential output of a motor, of the vacuums rather than the horsepower that is actually achievable using a standard wall outlet.

The Court originally certified a nationwide class, which certification was reversed on appeal. *Hale v. Emerson Electric Company*, 942 F.3d 401 (8th Cir. 2019). On remand, the issue of class certification remains pending. Plaintiffs now

seek class certification with five state sub-classes, to wit, Missouri, Illinois, California, New York, and Louisiana. Currently, and prior to the hearing on certification, Defendant moves to exclude the opinions of Stefan Boedeker and Laurence Nagel.

## Expert Testimony Standard

Federal Rule of Evidence 702 and the standards set forth in *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993), govern the admissibility of expert testimony in federal court. Rule 702 states:

> If scientific, technical, or otherwise specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. "District courts must ensure that all scientific testimony is both reliable and relevant." *Marmo v. Tyson Fresh Meats, Inc.,* 457 F.3d 748, 757 (8th Cir. 2006). "To satisfy the reliability requirement, the proponent of the expert testimony must show by a preponderance of the evidence both that the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid." *Id.* at 757-58. To satisfy the relevance requirement, the proponent must show that the expert's reasoning or methodology was applied properly to the facts at issue. *Barrett v. Rhodia, Inc.*, 606 F.3d 975,

2

980 (8th Cir. 2010). The Court must act as a "gatekeeper" in determining the admissibility of expert testimony and must "make a preliminary assessment of whether the proffered expert's methodology is both scientifically valid and applicable to the case." *Bland v. Verizon Wireless, (VAW) LLC*, 538 F.3d 893, 896 (8th Cir. 2007); *see also Daubert*, 509 U.S. at 597. A district court's inquiry on class certification is "tentative, preliminary, and limited." *In re Zurn*, 644 F.3d at 613 (quoting *Coopers & Lybrand*, 437 U.S. 463, 469 n.11 (2011)). Thus, the Eighth Circuit requires this Court to "scrutinize the reliability of the expert testimony in light of the criteria for class certification and the current state of the evidence." *Id.* at 614; *see also In re Dicamba Herbicides Litig.*, No. MDL 2820, 2019 WL 6340260, at *2 (E.D. Mo. Nov. 27, 2019).

The Court is entitled to substantial discretion in determining whether expert testimony should be allowed. "There is no single requirement for admissibility as long as the proffer indicates that the expert evidence is reliable and relevant." *Russell v. Whirlpool Corp.*, 702 F.3d 450, 456-57 (8th Cir. 2012) (quotation omitted).

## Discussion

**Motion to Exclude Opinions of Stefan Boedeker**

Stefan Boedeker is an economist and econometric statistician hired as a damages expert by Plaintiffs. Boedeker has developed a model, using both a

3

Hedonic Regression Analysis and Choice Based Conjoint Analysis, which Plaintiffs claim is capable of calculating class-wide damages suffered in this matter. The model was detailed in his original report dated November 18, 2016, as well as in his June 24, 2017 Rebuttal Declaration.  The model was expressed as applying to a then-anticipated nationwide class of purchasers of Defendant's RIDGID vacuum. Boedeker authored a supplemental report dated July 16, 2021. The supplemental report stated that: (1) the approach and methodology used for the model itself can be easily transferred, replicated, applied and/or amended, as applicable, to any state, including Missouri, Illinois, California, New York, and Louisiana; and (2) the same data, approach and methodology for the time period following the time range used in Boedeker's original report can be used for the new, expanded data sets broken down by state.

Originally, this matter was based on a nationwide class of RIDGID purchasers and whether Defendant's use of "peak horsepower" in its advertising is misleading.  As noted *supra*, the Eighth Circuit reversed the certification of the nationwide class and remanding the action for further proceedings.  Plaintiffs then sought to certify the class with five separate sub-classes for different states.  These events change the complexion of the case such that Boedeker's previous analyses no longer apply to the facts of the case.  Indeed, Boedeker's Supplemental Report recognizes that modifications to his original report are required in light of the

separate state sub-classes and the new class periods. Boedeker has not, however, submitted any of the stated necessary modifications to his original report. Merely stating that the report remains applicable to the issues, which now include five different state sub-classes, with possibly various different statutes, does not necessarily make it so. Neither "*Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered. See *Turpin v. Merrell Dow Pharmaceuticals, Inc.,* 959 F.2d 1349, 1360 (C.A.6), cert. denied, 506 U.S. 826, 113 S.Ct. 84, 121 L.Ed.2d 47 (1992)." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Boedeker's supplemental opinion fails to relate his original opinion to the facts and circumstances of the case at this juncture. The gravamen of Boedeker's opinions is the lack of reliability as applied to the stature of the case; it therefore fails in one of the most fundamental areas of ascertaining the admissibility of an expert's opinion.

Furthermore, as Defendant points out, questions arise regarding the reliability of Boedeker's opinions since he fails to adjust RIDGID vacuums with regard to supply when he does so with regard to demand. Although not binding on this Court, the Court finds the reasoning of *In Re General Motors LLC Ignition Switch Litigation*, 407 F.Supp.3d 212, 226-33 (S.D. NY 2019) particularly applicable to the issues herein.

5

"Missouri law recognizes the benefit-of-the-bargain defect theory" for claims sounding in contract and tort. *3ACC Op.*, 2016 WL 3920353, at *34. As for the proper *measure* of such damages, which the Court has not yet had occasion to address, Missouri law recognizes the traditional rule that contract damages should place an injured party, "as far as it is possible to do so by a monetary award, ... in the position he would have been in had the contract been performed." *Boten v. Brecklein*, 452 S.W.2d 86, 93 (Mo. 1970) (internal quotation marks omitted); *see id.* (noting that the injured party "is entitled to the benefit of his bargain, that is, whatever net gain he would have made under the contract" (internal quotation marks omitted)); *see* Mo. Ann. Stat. § 400.2-714 ("The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount."). At the same time, such damages should not "place [a] plaintiff in a *better* position than he would have been had the contract been completed on both sides." *Brecklein*, 452 S.W.2d at 93 (emphasis added) (quoting *Dingman v. Elizabeth Arden Sales Corp.*, 284 S.W.2d 16, 18 (Mo. Ct. App. 1955)). Along similar lines, the Missouri Plaintiffs' sole remaining statutory claim, arising under the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. § 407.010 *et seq.*, requires proof of an "ascertainable loss," measured according to "the benefit-of-the-bargain rule, which compares the actual value of the item to the value of the item if it had been as represented at the time of the transaction." *Plubell v. Merck & Co.*, 289 S.W.3d 707, 715 (Mo. Ct. App. 2009).

As in the other two Bellwether States, when Missouri law is concerned with "value" as a measure of damages, value refers to *market* value. *See Larabee v. Eichler*, 271 S.W.3d 542, 548 (Mo. 2008) (en banc) ("[The] 'benefit of the bargain' rule[ ] ... states the appropriate measure for damages in a fraudulent misrepresentation case is the difference between the fair market value of the property received and the value if the property the value if the property had been as represented."). Indeed, a long line of Missouri cases equate "actual value" with "market value." *See, e.g.*, *Metro. St. Ry. Co. v. Walsh*, 197 Mo. 392, 94 S.W. 860, 868 (1906) ("[T]he market value of the property means its actual value, ... that is, the fair value of the property as between one who

6

wants to purchase and one who wants to sell it; not what could be obtained for it in peculiar circumstances when greater than its fair price could be obtained; nor its speculative value; nor the value obtained through the necessities of another.... The question is if the defendant wanted to sell its property, what could be obtained for it upon the market from parties who wanted to buy and would give its full value." (internal quotation marks omitted)). Testimony regarding the subjective, or private, value of property to its owner does not suffice. *See, e.g.*, *St. Louis, Keokuk & Nw. R.R. Co. v. St. Louis Union Stock-Yard Co.*, 120 Mo. 541, 25 S.W. 399, 400 (1894) (distinguishing between the "opinion of [a] witness as to the value of the property to the owner, and [the property's] market value," where "[i]t was the market value that was the question of inquiry and consideration"); *Evinger v. McDaniel Title Co.*, 726 S.W.2d 468, 474-75 (Mo. Ct. App. 1987) ("Proof of fair market value cannot be supplied by evidence as to the value of the property to the plaintiff individually, as a witness' subjective opinion or his feeling or guess as to the value of property may not be equated with or substituted for fair market value.").

******

"While diminished value is the preferred measure of damages in tort cases because it restores plaintiffs to the positions they were in had the tort not been committed, the particular facts of each case determine which measure is appropriate." *Kaplan*, 166 S.W.3d at 72; *see also Clayton Ctr. Assocs. v. Schindler Haughton Elevator Corp.*, 731 F.2d 536, 540 (8th Cir. 1984) (noting that where Missouri law's "goal in awarding damages is to give the injured party the benefit of its bargain, .... [t]wo alternative measures of damages are used to achieve this goal" in repair contract cases: either "the cost of repair or completion of the contract work, or the diminution in value ... caused by the breach.... [T]he particular facts of each case seem to govern which measure of damages is appropriate.").

******

[U]nder the substantive law of all three Bellwether States, [Missouri and California included,] market value is determined by the interaction of *both* supply *and* demand. *See, e.g.*, *Children's Hosp. Cent. Cal. v. Blue Cross of Cal.*, 226 Cal.App.4th 1260, 172 Cal. Rptr. 3d 861, 872 (2014) (stating that fair market value is "is the price that a willing buyer would pay to a willing seller, neither being under compulsion to buy or sell, and both having full knowledge of all pertinent facts" (internal quotation marks omitted)); *In re Marriage of Cream*, 13 Cal.App.4th 81, 16 Cal. Rptr. 2d 575, 579 (1993)

7

(stating that fair market value "is the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no obligation or urgent necessity to do so, and a buyer, being ready, willing and able to buy but under no particular necessity for so doing"); *Peterson v. Cont'l Boiler Works, Inc.*, 783 S.W.2d 896, 900 (Mo. 1990) ("Fair market value is not determined by value to the owner alone; it is measured also by the price that one who wishes, but does not need to buy, will pay."); *Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 521 (5th Cir. 2013) (noting that, under Texas law, "[m]arket value is the amount a willing buyer, who is under no obligation to buy, would pay to a willing seller, who is under no obligation to sell"); *Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 831 (Tex. 2014) (observing that an "offer price does not, alone, tend to establish the property's market value at the time it was made. [An] offer is some evidence of what a willing buyer will pay, but it is not, alone, evidence of what a willing seller will accept"). Evidence that fails to account for both phenomena is not evidence of market value.

Relying on these principles, New GM argues that Plaintiffs' evidence is insufficient to permit a reasonable jury to award "difference-in-value" damages. *See* New GM SJ Mem. 19-24 & nn.10-12. New GM contends that the evidence upon which Plaintiffs rely to show a difference in value between what they paid for and what they received — namely, the expert analysis of Stefan Boedeker — is insufficient to prove difference-in-value damages under the substantive law of the three Bellwether States. *See id.* at 22-24. Notably, in response, Plaintiffs do not point to any *other* evidence that could support a finding of damages.

******

Although the issue is a close one, the Court concludes that New GM has the better of the argument. The core of Boedeker's opinion is that "[t]he non-disclosure of defects caused class members," including the named Plaintiffs, "to overpay for their vehicles." Boedeker Report ¶ 22. To arrive at this conclusion, Boedeker used a survey methodology known as "conjoint analysis." *Id.* ¶ 23. Conjoint analysis measures consumer desires by asking survey respondents about their relative preferences for certain combinations of product features. *Id.* ¶ 25; *see, e.g.*, *Saavedra v. Eli Lilly & Co.*, No. 2:12-CV-9366 (SVW), 2014 WL 7338930, at *4 (C.D. Cal. Dec. 18, 2014) ("Conjoint analysis is a statistical technique capable of using survey data to determine how consumers value a product's individual attributes — often called the market's willingness to pay."); *accord Hadley v. Kellogg Sales*

8

*Co.*, 324 F. Supp. 3d 1084, 1103-04 (N.D. Cal. 2018); *Zakaria*, 2017 WL 9512587, at *9. On Boedeker's telling, for example, a conjoint analysis survey might ask consumers whether they would choose to buy cotton seeds with one set of features for $16, seeds with a more advanced set of features for $75, or if — presented with that choice — whether they would instead buy neither seed. Boedeker Report ¶ 25 fig. 1. By evaluating respondents' answers to such questions, conjoint analyses "measure preferences for product features, ... how changes to price affect demand for products or service[s], and ... forecast the likely acceptance of a product if brought to market." *Id.* ¶ 24 (internal quotation marks omitted).

<div style="text-align:center">******</div>

By compiling and analyzing responses to [ ] survey questions, Boedeker was able to estimate the amount that consumers would be willing to pay for a vehicle with a particular defect that was fully disclosed — as in the above example, a vehicle with a fully disclosed side airbag defect. *See id.* ¶ 116. Boedeker was thus able to construct hypothetical "demand curves" for vehicles in the "but-for" world — that is, the world in which New GM had disclosed the alleged defects before selling the allegedly defective cars. *See id.* & fig. 19. Significantly, however, Boedeker's model focuses only on changes to the demand side of the equation. That is, he calculated only how *consumers' willingness to pay* would be affected by the disclosure of the defects at issue. *See, e.g.*, ECF No. 6075 ("Pixton Class Cert Decl."), Ex. 40 ("7/6/18 Boedeker Dep."), at 462:11-18 ("Q. You are not opining that new GM would be willing to sell these option packages at the prices offered in your conjoints, are you? ... A. I'm not opining on New GM's willingness to sell those option packages at those prices. That is correct."). Indeed, Boedeker's report explicitly assumes that the supply curve — that is, the range of prices at which New GM would be willing to *sell* any given quantity of defective cars — would remain unchanged in the "but-for" world in which those defects were fully disclosed. *See id.* ¶ 66 ("The number of vehicles that were supplied without disclosure in the actual-world is identical to the number of vehicles supplied in the but-for-world where the defect was disclosed and for which economic losses have to be computed.").

In his rebuttal report, Boedeker clarifies that he made this assumption in order to fit a particular legal interpretation of how to measure benefit-of-the-bargain damages. *See* Boedeker Rebuttal Report ¶ 565. "[P]laintiffs' damage theory," he explains, "is 'benefit-of-the-bargain' damages, which requires no consideration of *changed* supply because the supply in the but-for-world is

<div style="text-align:center">9</div>

the same number of defective vehicles that were supplied in the actual world with the only difference that GM concealed the defect in the actual world but disclosed the defect at the point of purchase in the but-for-world." *Id.* Thus, Boedeker did not estimate any possible changes in New GM's willingness to *sell* a car with a known, acknowledged, and disclosed defect — instead, he assumed that "the new equilibrium" (*i.e.*, market) "price" in the but-for world would be the price at which "all the purchasers of defective vehicles in the actual-world would also buy in the but-for-world." Boedeker Report ¶ 67. Using that methodology, Boedeker came up with a chart that Plaintiffs cite as their sole evidence showing difference-in-value damages. *See* Berman Decl. Ex. 43. The chart lists each named Bellwether State Plaintiff and Boedeker's estimated economic loss damages based on his conjoint analysis of consumer willingness to pay for a vehicle with the particular alleged defect fully disclosed. *Id.*; Pls.' SJ Opp'n 34.

Under the substantive law of the Bellwether States discussed above, this evidence does not suffice to establish damages. The benefit-of-the-bargain theory awards damages based on the difference between what the plaintiff paid for and the fair market value of what the plaintiff received. As Boedeker acknowledges, fair market value is determined according to the equilibrium price of a good, Boedeker Report ¶ 43, and the "equilibrium price is not the simple average of all consumers' willingness to pay. Rather, the equilibrium price depends on supply and demand," *id.* ¶ 44. "In other words," Boedeker himself explains, "the willingness-to-pay does not necessarily reflect the actual price that a consumer ends up paying for a product." *Id.* ¶ 46. The problem is, as Boedeker himself acknowledges, his model measures only the effect that a disclosed defect would have on *willingness to pay. Id.* ¶ 67; Boedeker Rebuttal Report ¶ 565. Indeed, Boedeker straightforwardly admits that he did not inquire into New GM's willingness to sell… Boedeker's evidence thus measures consumers' private valuations (on average) of certain hypothetical GM vehicles sold with fully disclosed defects; it does not measure the *market value* of those vehicles. For that reason, Boedeker's conjoint analysis does not provide competent proof of Plaintiffs' damages. Notably, that conclusion is supported by a handful of decisions that have (in various procedural contexts) rejected conjoint analyses as evidence of market value for precisely the same reason. *See Zakaria*, 2017 WL 9512587, at *17-21 (decertifying a damages class because a conjoint analysis that measured only plaintiffs' changed willingness to pay was "insufficient to establish a basis for calculating either restitution or actual damages" under California law); *In re NJOY, Inc.*

*Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1119 (C.D. Cal. 2015) (denying class certification because the plaintiffs' proffered conjoint analysis tested only what consumers were willing to pay "without considering other factors in a functioning marketplace," and therefore "[did] not address the fair market value of NJOY's e-cigarettes absent the misrepresentations and omissions." (emphasis omitted)); *id.* at 1122 ("A consumer's subjective valuation of the purported safety message, measured by their relative willingness to pay for products with or without the message, ... does not permit the court to calculate the true market price of NJOY e-cigarettes absent the purported misrepresentations." (emphasis omitted)); *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846 (LHK), 2014 WL 976898, at *12 (N.D. Cal. Mar. 6, 2014) (denying a motion for permanent injunctive relief because the proffered conjoint analysis measured only demand and did "not account for supply at all, much less the real-world intersection of market demand and market supply, which sets the real-world market price," leaving the plaintiff without evidence of a price increase); *Saavedra*, 2014 WL 7338930, at *5 (denying class certification because the proffered conjoint analysis accounted for demand but not supply, and reasoning that such a "method of computing damages converts the lost-expectation theory from an objective evaluation of relative fair market values to a seemingly subjective inquiry of what an average consumer wants. The Court has found no case holding that a consumer may recover based on consumers' willingness to pay irrespective of what would happen in a functioning market (i.e. what could be called sellers' willingness to sell).").

*In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212, 234–37 (S.D.N.Y.), *motion to certify appeal granted, reconsideration denied,* 427 F. Supp. 3d 374 (S.D.N.Y. 2019).(footnotes omitted).

Without consideration of market supply in his analysis the opinion fails to set forth a reliable basis to assist the trier of fact in ascertaining potential damages.

Plaintiffs attempt to distinguish the above conclusions based on the various types of product at issue is unavailing. Regardless of the *product*, the supply and

11

demand analysis to reach the real market value for ascertaining damages applies to all products.

The motion to strike the opinions of Stefan Boedeker will be granted.

**Motion to Exclude Opinions of Laurence Nagel**

Defendant moves to exclude the opinion of Laurence Nagel, an electrical engineer retained by Plaintiffs to opine as to whether Defendant's advertising was misleading. Defendants argue that Nagel is not qualified to give an opinion regarding the misleading nature of the advertisement because he lacks qualifications, foundation, and methodology. Plaintiffs argue that Nagel is qualified; his opinions define and describe peak horsepower within the realm of thermodynamics.

Contrary to Plaintiffs' argument, the question to be resolved in this case is not an engineering issue. Rather, the core and basis of Plaintiffs' Complaint is that they, as consumers, were mislead by Defendant's advertising.  As such, if expert testimony is to be admitted in this regard, the expert must be qualified to testify as to what advertising would mislead a consumer into buying a product that is advertised as something it is not. Under *Daubert,* as there is no scientific basis or other reliable methodology for Nagel's opinions that Defendant's advertising is misleading because peak performance allegedly cannot be achieved through an ordinary wall socket. Nagel's years of experience as an electrical engineer has

Case: 4:12-md-02382-HEA  Doc. #: 249  Filed: 10/28/21  Page: 13 of 14 PageID #: 17425

absolutely nothing to do with the effect advertising has on a consumer's decision to purchase the RIDGID vacuum. Admittedly Nagel has no expertise regarding advertisements or what drives consumers' purchasing decisions. *See Filtration Sols. Worldwide, Inc. v. Gulf Coast Filters, Inc.*, No. 08-0102-CV-W-FJG, 2010 WL 148442, at *3 (W.D. Mo. Jan. 12, 2010)

While an expert may be qualified to testify with respect to certain aspects of the issues, it does not follow that the same qualifications extend beyond the scope of that expertise. There is no reasonable factual basis for Nagel's opinions. Nagel's own testimony attests to the fact that he knows nothing about advertising and marketing, or vacuums, thus, his conclusion that Plaintiffs were misled by the advertisement regarding peak performance is nothing more than pure conjecture. *Weisgram v. Marley Co.*, 169 F.3d 514, 520 (8th Cir. 1999), *aff'd,* 528 U.S. 440, (2000).

The opinions of Laurence Nagel will be excluded.

## Conclusion

Based on the foregoing, the opinions of Stefan Boedeker and Laurence Nagel do not satisfy the requirements of Rule 702 and Daubert and will be excluded.

Accordingly,

13

**IT IS HEREBY ORDERED** that Defendant's Motion to Exclude the Opinions of Stefan Boedeker, [Doc. No. 227], is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Exclude the Opinions of Laurence Nagel, [Doc. No. 229] is **GRANTED**.

Dated this 28th day of October 2021.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE